Our next case is Illumina in Second Home v. Ariosa Diagnostics and Roche Sequencing, 2019-14-19. Mr. Reines. May it please the Court, Your Honor. The District Court improperly found patent-ineligible an innovative method to create an unnatural preparation of enriched fetal DNA. using human-engineered size filtering that balances competing considerations. And the problem with the District Court's analysis is that the claims are directed clearly to those thresholds. That's clearly what's innovative in the claims, and it's clearly what the inventions are about. What is it that you say the claims are directed to? To my analysis, Your Honor, they're directed to the filtering thresholds for creating an enriched DNA preparation. Filtering thresholds? Is that in the patent? Yes. The claim would be to the step of selectively eliminating above 500 in the case of the 751 patent, 500 base pairs or greater, or in the case of the 93 patent, 300 base pairs or greater. So it's taking a mixture of DNA and then... Is it directed to the process of that separation? It's a method, yes, clearly a method, and it's... That's what you're saying the claims are directed to, the method of separation. The method of taking a mixed sample and separating, not separating, but selectively, it's not really separation in my mind, it's selectively removing. A mixed sample is a sample of blood from a pregnant woman. It would include fetal and maternal DNA. Right, so that's your sample, and you're saying that the claims are directed to separating from their fragments of DNA that are less or greater than 500 base pairs? Separating isn't the clearest way to say it. I think it's really removing. Removing. Because you're not then doing something with... So basically you're removing out of that sample all of the... Larger. Maternal DNA. No, that's the point. The point here is that there is no one point of size where it's... If it's greater than 500, it's all maternal. If it's less than 500, it's all fetal. It's not that simplistic. Mr. Reines, isn't your point that this is a method of manufacture? It is manufacturing of preparation. The claim itself says it's a method of preparing a DNA fraction. Yes. Yes, Your Honor. And the point is that... Your claim is properly described as directed to a method of creating a tool, which could later be used in a diagnostic process, but the claim itself is directed to creating a tool, like a spectrographer or anything else that might be used in a process. I think you're right, Your Honor. And that tool apparently is a fraction, right? The tool is a method, is a preparation of enriched DNA that contains more fetal. But the point I want to make, because I want to address something that Judge Reina, you made a good point, which is, is 500 the dividing line between everything above 500, the maternal DNA, and everything below 500, the fetal DNA? And that's not the case. As Table 1 shows, there's dramatically different ratios. Let me direct your attention to the appendix. It's 31. The summary of invention. Yes. Portion. And column 1, around line 55. So we're looking there, and it's talking about this surprising discovery, correct? That's correct, Your Honor. And it goes on, and it refers to fetal DNA, and it refers to the size, 500 base pairs or less. Whereas it goes on and talks about greater than or less than the 500 base pairs, and maternal circulation has been found to be smaller. There again, we're talking about the maternal. It keeps going on to column 2, and it says, so, so far, that's not your discovery. Well, it's identifying thresholds. So, I mean, I don't know. Okay, if it's identifying thresholds, and I'll come back to that. Let's look on to the following column. It says, this surprising finding, which I agree, it's a great finding. It's a great discovery there. But let's see now if that discovery is worthy of penning. It says, it forms the basis of the present invention. So I take it that what I read before is the basis of the present invention. You read a whole paragraph that's, you know, a lot of sentences, but yes. Okay, good. Then it goes on, and it deals with the selective enrichment, and it goes to the point I'm coming to. It says, this leads to a fraction, which is largely constituted. And it's getting to that point that is what you call adjusting the pool or finding my size, this particular DNA. This is a fraction of the pool of the original sample. Yes. You're getting to a fraction of that. So what is it that the claims are directed to? The process to get to the fraction? Well, I mean, there's been different articulations, and I embrace those, but. The articulation I'm pointing to is in the point itself. I think it's clearly directed to selecting a size point, and it uses the language in the claims. I'm not re-changing that, but let's say, for example, 500 uses approximately. And it's saying, that's a good point from a human engineering. There's a human engineering judgment made that that's the point where you keep enough fetal. You increase the fetal enough, but you're not eliminating so much DNA that you don't have anything left. How is it done, Mr. Reines? How is it done? Well, there's any number of. This is a method. What does the method consist of? Not just the result, but the steps. I mean, the steps are obviously laid out in the claim, but they include taking the original sample, extracting the DNA, producing the fraction by size discrimination, and a selective removal step, which can be done any number of ways. One of the ways of doing this, by the way, is through a microarray. That's claim 11 of the 931 patent. That has never been done, the evidence in the record. So there's summary judgment problems with that. What does microarray consist of? Is that a process? It's a process. It's a tool that's used in a process. I'm looking at claim 7. And that, to me, comprises a process, centrifugation. Maybe that is how you separate these and make and prepare this fraction of DNA. That's one way to do it, yes. Yes. But the point I want to make... Just to be clear, you didn't invent that process. Yeah, one claim step isn't the invention. The invention is the overall. That particular claim step was not invented. That's not your invention. These centrifuges are not the invention. In fact, the patent teaches us that that's kind of well-known. Well, applied to cell-free DNA, the record is to the contrary as to some of the steps. And, for example, the microarray. Cell-free DNA tends to be smaller, and using a microarray was unknown at the time. And Dr. Stokowski testified to that, and that's set out in my briefs and not disputed. So, yes, with respect to some of the steps, clearly it's innovative to have applied particular tools to the sample in the way that they did. But I do want... When you discriminate amongst the DNA in order to get the size sample that you want of the prenatal DNA, how do you do that? How do you get to that? You can do that in different ways. You can use electrophoresis. You can use a centrifuge. There's different techniques that can be do that haven't been applied necessarily to cell-free DNA. This was the infancy. But your claim or your invention, the claims are not directed to centrifuging or those other steps. Well, I think that's incorrect in terms of inventive contribution for certain dependent claims. I'm not saying that your claims don't mention it. I said your claims are not directed to that. That's not what you... But there's a dependent claim that adds the concept, for example, of using a microarray with respect to cell-free DNA, for which there's no precedent. Which claim is that? That is claim 11 of the 931 patent. And the evidence that that was unknown is at 263. Mr. Reines, it's not determinative, of course. But do these patents derive from the earlier sickmanome patent that was the subject of a... No. It's a different family. But the point I want to make, Judge Reine, that I really don't think I've communicated effectively yet, is in Table 1, the mixture as to what's fetal and what's maternal, every sample is seemingly different. So, for example, on Table 1, it says that in one sample, it was below 300 base pairs was 22% fetal DNA. For another sample, it was 87% fetal DNA. So... So, Mr. Reines, are you saying... I'm sorry, I'm going to jump ahead. I should let you finish. That's okay. No, please. I think what I understand you to be saying is this claim might be different if it just said separate out all maternal DNA from fetal DNA, centrifuged, you know, whatever. But there was actually a point of innovation in selecting the number 300 and the number 500. And the reason that point of innovation is not just flow from the idea that maternal strands are longer, it also incorporated a lot of back and forth testing in advance to assess how do we maximize the amount of fetal DNA in a given sample. Every sample is different, and there are a lot of factors that go into it. And so from an engineering standpoint, how do we pick a number that's not necessarily all fetal DNA, but keeps us with a sample big enough to actually then later allow for diagnostic tools to figure out what they want? That's correct. So it's not the correlation between longer and shorter. It's the engineering of keeping in mind that correlation. How do we choose sort of a perfect number that is going to work the best with diagnostic tests that people need? Because they've got to have a big enough sample that includes enough of the fetal DNA. That is very articulately put. Because there's surely fetal DNA that exceeds 300 base pairs. And there's surely maternal DNA that's less than 300 base pairs. It's totally overlapping, and it's different sample to sample, and it's different application to application. And that's the startling discovery that's mentioned in the panel. No. Your Honor, I believe the startling – The thing you just mentioned in response to Judge Moore I find to be disclosed in the summary of invention portion of the panel. You and I walked our way through there, and there it describes the different sizes of the strands. No, because those are not – the point is that the 300 and the 500 are not any kind of natural law. They're a human engineering judgment. The point – the stunning – No, no. The human did not engineer those different sizes. Those different sizes already exist. You just found them. No, no. That's where it's so untrue. That is not correct, Judge Randall. Let me just have a minute to express that. The discovery, and I think this is undisputed, is that in general, maternal DNA is larger than fetal DNA. That's – I don't think there's ambiguity, Your Honor. It actually uses a size, 500 greater than, less than. Because you could pick any – you could pick different ranges or different points to say, okay, we want to get – keep some of the fetal DNA, but we don't – and make it more enriched, but we don't want to make our sample so small. So there's engineering decisions that need to be made depending on your nature of your test. That's human judgment. I want to focus on this engineering because I want to make sure that you're not claiming that you – that somebody engineered these sizes or the size differences. That is already naturally occurring. They're varied from person to person. No, but what the good point is to use across all samples – Nobody invented those size differences. Nobody invented that there's a tendency. But what the number is to divide it at is a human judgment as to where you want to make the break point to balance competing considerations in different contexts. It may be different. That's the point. Their own witness, Dr. Stutowski, said, well, where you set that number depends on what you're doing and how you want to do it. You may want longer DNA for some purpose. You may want to just make it 700 or 1,000. Or you may want to get rid of so much of the maternal DNA because you're crazy to get rid of it all. And you make it 1 or 10. So there's judgments that are just part of the process. And they're not a natural law. They are not. Counsel, you're just about running out of time. We'll give you two minutes for rebuttal. Thank you. Ms. Dury. Thank you, Your Honors. And may it please the Court, Daryl and Dury for Apeliz. The specification here describes the invention as being directed to the supposed discovery of this size variation in DNA fragments. And if we take a look at Claim 1 of the 9-3 patent at Appendix 42, it is a method comprising extracting DNA, producing a fraction, selectively removing longer fragments, and then analyzing the DNA fragments that remain in the fraction. But it recites a method of preparing a DNA fraction. Now, whether it's obvious or not, or whether it's well-supported in 112 sense, the question here is 101. Correct. Is it the type of claim, type of subject matter, that falls within eligible classes of subject matter? Now, this is a process, right? It isn't claiming the natural law. It is a process in precisely the same way that the claim in Ariosa v. Sequinome was a process.  It was obtaining a fraction, amplifying certain of the DNA in that fraction to change... Well, obtaining a fraction is sort of a useless kind of step in a method claim. It simply is equivalent to starting with something. Correct. And then the steps are amplifying and analyzing. Right. And here, the only difference is that instead of amplifying, we have separating. That's a step. That's a physical step. So amplifying is a physical step. It changes the composition of the pool of DNA. Separating is a physical step. It likewise changes the composition of that pool by removing certain things from it. But there's a long line of precedent that simply removing one natural material from its environment and then analyzing it is not patent eligible. And that's all that is claimed here. Now, we heard a lot about the supposed human ingenuity in identifying these 300 base pair and 500 base pair numbers that appear... Well, that's sort of puffery. We're not really talking about known obviousness. The question here is eligibility. That's right. And Illumina is trying to rest on the supposed human ingenuity in those 300 and 500 numbers as giving rise to eligibility. And I just want to make clear, nothing in the specification suggests that those numbers result from human ingenuity. They result from the conventional technology that was used to perform the original test itself. This is Appendix 41, Column 5 of the 931 patent. What we see is that the ladders that were used to analyze the size of the DNA fragments cut off at 300 and cut off at 500 because of the conventional technology that was used. All the patent then says is, if you want a sample that is enriched for fetal DNA, you're going to choose the fraction that is smaller than 300 or the fraction that is smaller than 500 because in the results that are set forth in Table 1, as a matter of the natural phenomenon, those are the fractions that have more fetal DNA in them. What our witness said in her deposition was, of course, depending on what you want to do, you might choose a different fraction. If you're enriching for maternal DNA, for example, you would choose a larger one. That doesn't detract, Adrena, from your point that the amount of fetal versus maternal DNA in any given fraction simply is the natural phenomenon that the inventors here purport to have discovered as the basis for their invention. There is no description of any human ingenuity whatsoever in arriving at any special way to take advantage of that phenomenon. Instead, what there is are conceitedly routine steps to do nothing more than analyze the DNA that's in that sample, having removed some of it. Once again, we're talking about eligibility. Correct. Most chemical process steps are routine. There are very few and rare new process steps. The method of making a material consists of old process steps, and they may not be non-obvious. They may not be well supported under 112. But once again, they are physical, tangible steps, and we're talking about eligibility. As was the case in Ariosa, as was the case in Cleveland Clinic, as was the case in a number of this Court's precedents addressing the eligibility of method claims. Here, we start with a composition of natural material. We end with a composition of natural material. All that we do in between is separate some of it from the other and analyze it in this entirely unspecified fashion. So at the level of step one, what are the claims directed to? They are directed to nothing more than the size variation within the pool of DNA. At the level of step two, are there any innovative techniques or new and non-conventional techniques that are being used in that method? The answer to that question is no. The only thing that we heard specific reference to was the use of these nucleic acid arrays. That is described in column three of the 931 patent beginning around line 35. All that the patent says about the use of these arrays is that the determination of fetal genetic traits can be affected by methods such as, for example, PCR technology, ligase chain reaction, probe hybridization, nucleic acid arrays, and the like. There is no suggestion in the specification that that's not simply routine and conventional technology. And very notably here, because this was summary judgment and not a motion to dismiss, Illumina had the opportunity to put in expert testimony contesting the proposition that that is routine and conventional technology and elected not to do so. We had shifted the burden to them by pointing to that disclosure in the specification. There's simply no evidence in the record to support the proposition that that's not routine. All our witness said was she was unaware of the use of that technology specifically in this technological context to look at cell-free DNA. But that's not the right question. The question is, is it routine more generally in the context of DNA analysis? The other question could be, is there an improvement on those routine or conventional steps? And does this patent show that there's any type of improvement there? And the answer to that question is no. There is nothing in the patent specification that suggests that this improves over conventional technology. What it says is that it makes use of conventional technology. The only thing that is different is that it is using that conventional technology to analyze this DNA sample based on size differences. Now, we can test that that's new, but even if it is, that's the natural phenomenon at issue. And this Court's precedent and the Supreme Court's precedent is clear that you can't import into Step 2 to allege novelty from the supposed natural phenomenon itself. What if this claim read a method of separating DNA so that the base pairs are greater than 500 from those that are less, consisting of centrifuging them? Would that pass muster under 101? No, Your Honor. And that's because what matters for purposes of 101 in Step 1 is the substantive gist of what the claim is directed to and not merely the language that is used to describe that substance. But that's what patent law is all about. So I would suggest language matters a great deal in patent law, but it matters to the extent that it describes salient differences. And in Cleveland Clinic, this Court was presented with that linguistic question and said that distinction is too superficial. This is not merely a task of looking at the words, it is a task of looking at the words mean. What was involved in Cleveland Clinic? Detecting a natural material? So that's right. Exactly what is at issue here, analyzing a natural material, which pursuant to Claim 12 includes detection as one potential form of analysis. So all in substance the claim here is directed to is natural material, get rid of some of it, look at what remains, where detection is one permissible form of analysis. But if you have a mixture of things, which because it's a mixture is not practically useful, and you separate the mixture into two portions, which makes one of them practically useful, that doesn't pass 101, must it? It does not. But if you present me with a pond with material floating in it, and I strain the pond in order to extract the material, the natural material that is sitting there and is useful, unless there is something novel about my practice of extraction, the answer to that question is no. As the Court held a myriad, simply removing something from its natural environment does not confer 101 eligibility. And that is the only thing that's happening here. Notably, those are the identical steps that Illumina undertook. Didn't Marietta, the Supreme Court, make it clear they weren't deciding whether it applied to process claims? They were only deciding that it applied to actual substance claims? So I agree that the claims at issue in the Supreme Court's decision in Marietta, and don't you agree that the Supreme Court expressly said we're not speaking to what would happen with regard to process claims? I agree. But there is no logical distinction between a composition of matter claim directed to that thing which has been extracted, and a method claim that encompasses as a step the extraction, if there is no novelty that is associated with that method. Certainly, as the Court in Marietta said... I feel like you're turning 101 into a novelty assessment. I don't understand. 101 is 101. It's not an assessment of what the... I mean, you're saying if the gist of the invention isn't novel. I mean, gosh darn, that was the rejected old 103 via Hotchkiss. And now you want to import what Congress expressly rejected as part of the patent system into 101 and give it new life? No. What I want to do, Your Honor, is focus at step one on what is the gist of the invention. And in cases like Ariosa, this Court has... What is the gist of the invention? I thought it's what is the claim directed to. Correct. What is the gist of the invention? What is the claim directed to? In Ariosa, where the claim was a method claim... It was a diagnostic claim. It was a method for... Was it a diagnostic claim? It was a method for performing a diagnosis. Yes or no, was it a diagnostic claim? Yes. Are these diagnostic claims? So this is simply a method, unspecified. So if we take a look at claim... I'll accept that as a no, this is not a diagnostic claim. Well, I would suggest the fact that in Ariosa, it said a method for performing a prenatal diagnosis and here in the 931 patent, it simply says a method comprising is not a substantial difference. The claim in Ariosa was more specific, I agree. The claim at issue here is more general. But the steps of that method claim are indistinguishable as between the two. Let's get away from the gist of the claim. Instead, go back and look at what this court has consistently asked in terms of step one of the 101 Inquiry. And that is, what is the focus... And I'd like for Mr. Reines to answer this question. What is the focus of the claim that vanished for the prior art? That's something that we have said in a number of cases, at least eight that I know of, that is to answer the question, what are the claims directed to? That is right, this court has consistently looked at the patent specification in order to answer that question. And here, the patent specification says that the invention is predicated on the surprising discovery of the difference in size of fragments of maternal and fetal DNA. There is nothing else that is described in the patent specification. I'm interested in how a claim to 300 base pairs and a claim to 500 base pairs can both be covering the, quote, natural law. Because the natural law is the size distribution of fragments. As a matter of the natural phenomenon, some fragments are lower than 300, and some fragments are lower than 500. And when Illumina used conventional technology to cut the DNA up into chunks of various sizes, some of those sizes were under 300, some were between 300 and 500, and it evaluated that. That is simply an evaluation of the range of fragment sizes that appear in the human body. There is then, obviously, a question of... The natural law is what? State it for me. The natural phenomenon is the size distribution of maternal and fetal DNA fragments. Okay, the size distribution isn't a natural phenomenon. That actually doesn't say anything. That's nonsense words. What is the natural phenomenon? The natural phenomenon is that this is bigger than this. What is the natural phenomenon? The natural phenomenon is that... The size distribution tells me nothing. Then Table 1 of the patent... No, I need you to tell me in words what the natural phenomenon is. That below 300 base pairs... Because despite American Excel, I still believe it's important that you can actually identify what it is you think the natural phenomenon is. Then I'm referring to Table 1, that at the size of DNA that is below 300 base pairs, approximately 70% of the DNA is fetal, and approximately 30% is fetal. That between 300 and 500, it's roughly 20% and 80%. And that over 500 base pairs, it is overwhelmingly maternal. That is the natural phenomenon. And what is the usefulness of that separation, determining at what point approximately you have something that is more useful and more indicative? There is nothing in the patent specification about that. All that is in the patent specification is that size distribution and the assertion that depending on what you want to do, you might want to pick a sample that is more or less enriched for fetal DNA. And that's because at the end of the day, that type of sample facilitates the diagnosis or the additional steps. Isn't it kind of like I want to put a brand on some ponies? I have a corral that's full of horses. And so now my job is to eliminate or take out, because it's going to facilitate the branding of the ponies, my job is to take out the big horses. And the only thing that's left in the corral are the little ponies, and that facilitates my branding. I didn't invent the size of the horses, and I didn't invent the brand. I just simply am separating them in order to facilitate the process. That is exactly right. However, let me build on the horsey analogy. What if you did discover that a particular size of horse was a better racer or a particular size of horse was better for some purpose? So you chose what size to keep and what size to exclude, because you found that that created a better tool. One of them hooks up much better to the cart you want to pull across your land than the other. Sure. Had Illumina done tests to determine that some particular ratio of maternal and fetal DNA was optimal in order to achieve some particular result and claimed that that was somehow unexpected or that there was some particular usefulness associated with that that was not simply a function of the size distribution itself, but was a function of something additional that they appreciated. But this is summary judgment, and they introduced evidence that demonstrates that the numbers they chose didn't exclude all the big horsies or segregate out all just the little horsies. You lost some of both in the process, and that the reason they chose those numbers is because it created a sample size that was actually well-suited for types of diagnostic testing that would need to occur and contained enough of what you were looking for. And that's all evidence, and this is summary judgment. How does the district court disregard all of that on summary judgment? The latter part of that, Your Honor, is incorrect. That is not in the record. What is in the record is the amount of maternal and fetal DNA in those samples, and that is it. Illumina did not put in any expert evidence or any evidence whatsoever that suggests that these particular ranges are optimized for any purpose whatsoever. The only assertion in the patent, and the only evidence of this is in the patent, and the only assertion in the patent is the sentence at column 5 of the 931, immediately preceding table 1, that says depending on the downstream application, the DNA size chosen for the enrichment of fetal DNA will be smaller than 300 or smaller than 500. That's it. There is nothing in here that suggests a judgment as to what is going to be optimal for a particular purpose. And again, 300 and 500 are numbers that do not result from Illumina's ingenuity. They result from the commercial ladders that they chose, commercially available, in order to engage in the test that led to this supposed discovery. A test that itself would, according to Illumina, infringe. And I think this is an important point. In arriving at this discovery about the size difference of DNA, Illumina did precisely the thing that they are now claiming is their invention. They extracted... Counsel, these horses have raced past the finish line. So I think we'll give Mr. Linus... Thank you, Your Honor. ...four minutes of rebuttal time. Thank you, Your Honor. First of all, I'd like to just correct a misstatement by counsel that goes to an important point. In Table 1, the 73% and the 26% for below 300 base pairs... Mr. Woodard, four minutes. Thank you, Your Honor. ...is those are medians, not the average. The range in the different samples were from 22% in one person to 87% in another, in terms of the percent of fetal when you make this cut. The reason that's important is there is no constant. This isn't Ohm's Law. This isn't some law of nature that 300 is... You're going to always have 80% less or 20% less. It's different in different people, and it might be... To the extent that she hinged her entire natural law claim on Table 1 and her representation that that amounted to an average, there's no way we could have possibly accepted it because it's actually wrong, as a matter of fact. That's true. And so the point there is that there is no constant. There is no... You know, a discovery that at 300, you're going to get 80% this way and 20% that way, or that... So it's like if there was a mixture of horses that were all different sizes, and you said, you know what, in general, we want to have a large herd because we need to carry a lot of stuff, but these are stronger. What we find is that at 600 pounds, or that's probably a bad number. I'm not an equestrian. But at 1,500 pounds, you keep enough strong ones, but you don't lower the herd so much that you have nothing left. That's human judgment. That's engineering, Your Honor. That is not a natural law that says, oh, this is the tipping point. I would think that engineering is a bit more what Judge Moore was suggesting, and that's to breed horses for a particular task and to invent a different horse, you know, one that can pull a bigger wagon or something like that. But that's not what's happening here. Here, you're just simply separating two different types of DNA so that you drain the water, and now you're left with the substance that you want to work with. That's it. No, it's not the substance you want to work with. There's maternal DNA. You want to work with the fetal DNA. It's not that. That's not what it is. You have a mixture still. You have to make a judgment how much you want that mixture and where it will land. But let me make this point, because I think this is the capstone. But you didn't invent that mixture. Just like in Cells Direct. No one has invented this mixture. That mixture already exists. All you're doing is separating by size, correct? We're making a judgment as to what the right hinge point is for these processes that are laboratory processes that you're using. But let me say this. Cells Direct, Your Honor, is nearly on point. It's nearly directly on point. That's liver cells that you want the ones that can survive freezing. So you freeze them, which is a trivial step. Everyone knows you could cryo-freeze. You freeze them, and you freeze them again. And you know what? You end up with more liver cells from the human body that you want because all you're doing is separating out the liver cells that can survive cold versus the liver cells that can't survive cold. How is that any different? It's not. And we go through this in our briefing. How do you distinguish this case from Ariosa? In Ariosa, all you did was you said you're detecting something that's present. Okay? You're not making a new preparation. You're just... The gee whiz there is there's cell-free DNA in the sample. You can detect it. This is saying there's a principle that in general, maternal DNA is larger than fetal. That's a discovery. And the way we're going to marshal that to a practical laboratory technique for a specific type of test is we're going to find... We're going to do testing and experiments, which some are shown in Table 1. And we're going to say, okay, if we do it at this number, we keep enough of the good stuff, but we don't get rid of too much of the good stuff. And that's a human judgment that's made based on laboratory analysis. And it's really no different than cells direct. Thank you, Counsel. Thank you, Your Honor. Case is submitted.